Now this group here represents our last argument of the week. We've had to wait all day, or morning anyway, to present it, so I'm glad for your sakes that we have finally reached this point. I call this final case, which is Otis Crandel et al. v. Jelena Hall et al. Mr. Thomas? I please the court, Bruce Thomas, on behalf of Brenda Worrell Estate and her heirs. Brenda Worrell is another casualty of the failure of county jailers in Texas to honor the requirement of the state's mandatory suicide screening form to provide a suicide watch when the screening form is not completed. The plaintiff's burden in this case is derived from Farmer v. Brennan in 1994 that states that a custodial officer acts with deliberate indifference. The officer knows that the detainee faces a substantial risk of serious bodily harm and disregards that risk by failing to take reasonable measures to abate it. I emphasize the word risk because I submit that that is a key term in the court's definition that it continues to return to. We don't have to actually prove the officers or jailers knew the detainee was suicidal. We have to prove that they knew that there was a substantial suicide risk. And Farmer states that we can prove knowledge of the risk as a fact question the same as any other fact can be proved. There is no clearly established law requirement as to how we have to go about establishing knowledge of the risk. So the factors here that display the risk are what? Four. Four categories that I've grouped them into. The screening form itself, which required a screening watch because of Brenda's failure to cooperate. Number two, her equivocal answer in response to the question as to whether she had previously attempted suicide. Three, the confiscation of her shoes, coat, and certain other personal items which could be used for self-harm. And four, Brenda's condition and demeanor at the time of her arrest and booking. Her agitated, intoxicated, distressed state and anger at being arrested when she was the one that called the police for help. Yet she was the one that was arrested in the accompanying video that shows this. Let me begin with the screening form and take them in that order if I may. The first category of evidence is derived from the screening form itself because it requires a mandatory suicide watch and notification of a supervisor when the jailer is unable to obtain answers to the questions on the screening form. And that anticipates precisely the facts of this case where Brenda refused to cooperate in providing them with information on the suicide screening form. Jailers in Texas are trained and required to presume that a detainee is suicidal until the form is completed and they have facts which show otherwise. The state of Texas has deemed that risk too great to do otherwise. Too many detainees die in the first hours of incarceration on what's commonly referred to as the incarceration shock. And the state of Texas has said that this is simply too great of a risk to ignore. So, jailers are trained that they are to treat detainees as suicidal until they complete the suicide screening form. Mr. Thomas, in this action, do you have a failure to train claim? Do we have a failure to train claim? I don't recall at this time, Your Honor. I just don't recall. But you've got other defendants. You've got other defendants in these, I'll just use officers, that are seeking individual qualified immunity. Yes, yes, yes. And our position on the officers with respect to the screening form is that there is testimony that they often participate in the screening and that they were right there and jumped in and aggressively participated and had the screening form right in front of them. But again, under the qualified immunity test we're dealing with, whether there's been a constitutional or statutory violation, your claim for this detainee, a failure to train claim that you seem to be talking about now, would be a separate course of relief for the plaintiffs in this case. Failure to train, if we assert a failure to train, would be to the jailers, but I'm not talking about a failure. I know you're not, but I'm just trying to point out that for these officers you have to show actual knowledge, subjective actual knowledge of this danger and knowing that failure to do something about it. I understand these various requirements to use these forms, and as you say, they tried to get her to participate in answering them. Yes. And there's a huge distinction, as you know. But of course the officers had the form right there with the instruction on it that she's to receive suicide watch if they're not answered. That's why they're in there trying to get her to answer. There's no case that says we have to prove knowledge of the risk only by conduct. Quote the portion of the form they were trying to get her to answer that says if detainee does not cooperate, detainee has to receive suicidal watch. Quote that provision. Yes, sir. If it's at hand. It is. Is the inmate unable to answer questions? If yes, note why. Notify supervisor and place on suicide watch until form completed. And in this case we assert that. Read that again, please. Yes, sir. Is the inmate unable to answer questions? If yes, note why. Notify supervisor and place on suicide watch until form completed. Don't you see a distinction between is defendant unable as opposed to does defendant refuse? No, your honor. Respectfully, I don't in this context. Even again under the standard here, we're looking at the qualified immunity, actual knowledge. You don't see a distinction between unable and refuse. No, your honor. I think in this context, given the requirements, given what the form is trying to get to, I think refuse is fairly encompassed in the meaning of unable because when the detainee becomes so agitated or for whatever reason decides that she's not going to participate, we don't know whether that's because of her psychosis. We don't know exactly why that is. But if she refuses, it's an inability. This isn't coming out of a domestic violence incident, 911 call, correct? Correct. And remember they were aware that both spouses may have had alcohol. Wouldn't the logic of your argument be that anyone who arrives and is belligerent because of alcohol has to be presumed to be suicidal? Your honor, the state of Texas default policy is everybody is suicidal until they get objective evidence that shows them the contrary. So that's the default policy. It's a high bar because of the incarceration shock. So many people have died in the first hours and here are minutes of incarceration that as a matter of policy to deal with this issue. But the logic of your opinion would be that actual subjective knowledge exists whenever an alcoholic is detained and isn't able to or doesn't answer questions on the form. Yes, your honor. In fact, this court dealt with that situation. In the second Sanchez case where in Yonge County all the detainees that came in that appeared to be intoxicated were all thrown into the drug tank. And the court and the county didn't attempt any suicide screening to determine whether they were actually just intoxicated or in fact were trying to commit suicide. And this court held that the plaintiff in that case stated a conditions of confinement claim for those conditions. So yes. Well, okay. I remember that case. I might have been on it. Conditions of confinement isn't being alleged here. No, no. It's not a conditions of confinement claim. I'm just making that up. When you list your four, and I agree with those four, that seems to be what has to be equivalent to actual knowledge. What about the fact, the tragic fact, doesn't it reduce their knowledge if they put her into a visitor's room? Because with a ligature, as you point out, I mean, that would truly suggest they didn't think she was suicidal. It was a terrible mistake. No, your honor. I think it terribly suggests deliberate indifference because that's what defines deliberate indifference and has for more than two decades because it's happened over and over. When jailers and officers put a potentially suicidal detainee into an environment where they have ready access to an obvious ligature, that's deliberate indifference, and that's our allegation, and I think that's what the evidence shows, that they did have subjective knowledge of the suicide risk, both from the form and both from the other factors that I'm going to address, and therefore they were deliberately indifferent in putting her in that environment with access to a ligature. To finish up on the first category, I want to emphasize that both this court and the Supreme Court, most recently in Lombardo v. St. Louis, have said that departures from an officer's training or failure to adhere to well-known guidance are important considerations in the constitutional analysis because in those instances the defendant has actually been informed of the danger of their activity. In fact, Lombardo reversed on that very basis. The court said not only was it good to consider Justice Department guidance about asphyxiation in that case, that was an excessive force case where the Justice Department had some years back issued a notice on the risk of asphyxiation, and it was a reversible error for the appellate court not to consider that. And notably, Lombardo did not require the plaintiff to prove that those St. Louis police officers actually had read that Justice Department memo, actually had seen that Justice Department memo. But is this slipping into your Kingsley argument? No, no, Your Honor. This is simply saying that the evidence that we presented about officers and jailers departing from their training as to what they're supposed to do puts them on notice that they are engaging in risky behavior that can harm the detainee. And that's what they did here by not putting her on a suicide watch, not notifying a supervisor, and just going ahead and putting her in a room with obvious ligature. The form doesn't say, if she doesn't answer the questions on the screening form, then stick her in a room with a ligature. That's just the opposite of providing suicide protection, and is obviously dangerous to the detainee who in the first hours of detention is liable to suffer from the incarceration shock that apparently occurred here. The rest of the jail was full, or is that not? Well, we're told that the reason the officers arrested Brenda was because they were told to pick one. They wanted to arrest both of them, but they were told to pick one because the jail was so full. Did the husband have an outstanding warrant like she did? Yes, as a matter of fact, he had one for homicide, an attempted homicide. And when you review the video, you'll see that. The officers originally are somewhat concerned about that, and they handcuff him as a result, and then later they decide that that's not a big deal, and they end up deciding that Brenda is the aggressor and that there's a lot of comments. There are a lot of male officers out there. It's not just these two guys, these two police officers. There are a lot of male officers. Brenda obviously feels like they're all taking her husband's side, and she just kind of gives up and says, okay, let's just assume it's all my fault. I'll go to prison and do five or ten years. At least I'll be out of this terrible condition that I'm in. And they pick Brenda and bring her in. You're saying he had an outstanding warrant for homicide or he had previously been charged with homicide? The officers say in the video that he has an outstanding warrant in another state for, I think it's an attempted homicide charge. Let me move on to the second category, the answer that Brenda gives in response to Jailor McGowan's question as to whether she had previously attempted suicide. Right before she puts Brenda in the room, she says, have you ever previously attempted suicide? Or words to that effect. And Brenda responds, I don't know. Have I? And bares her arms. Now the jailors say that that's a definitive indication that she has not attempted suicide, apparently showing that she has not slit her wrist in the past. But it's anything but. It's being, again, intentionally evasive. It's not answering the question. It raises all sorts of concerns when a detainee in that condition doesn't answer the question specifically. And first of all, it shows that suicide risk was top of mind to the jailor at that time. How do you know that? Did he say that? No, he didn't say that. That's an assumption on your part. I don't think that's a reasonable inference. It's not a reasonable inference you're saying that the suicide risk was top of mind? Of his mind. You said the jailor. Her mind, the jailor's. Sir? The jailor's mind, her mind. Jailor McGowan. Right. You're saying once she did that, with that sarcastic response, I think it's fair to say, that put suicide in the top of his mind? No. I'm saying that when she asked the question, have you ever attempted suicide, previously, right before she puts her in the room, that shows that that issue was top of mind to the jailor. Well, maybe. Because she asked the question. He was trying to get this person to fill out this suicide form, or mental health form, or whatever they were trying to get her to assist with. And after all the demeanor that she had witnessed, and after that encounter with her, she was concerned enough to ask Brenda Worrall, right before she put her in the room, have you ever committed suicide. So I think it's a fair inference that was top of the mind to her right then. And she got an ambiguous answer. And the last thing you should do with a detainee that's giving you ambiguous answers about suicide is put them in a room with an obvious ligature and leave them there alone and unattended. And additionally, no doubt, because suicide was top of mind, that she confiscated items of potential harm. I mean, she says, McGowan says, that she confiscated Brenda's shoes, coat, eyeglasses, and loose glass lens. So Worrall will not use those items as devices to hurt herself or others. So that portrays her subjective knowledge, McGowan's subjective knowledge, that she subjectively believed Brenda, at that time, was at risk for self-harm. That's the same sort of evidence this court found compelling in Commerce v. Kino. And the other defendants were right there when this occurred, witnessed it. The police officers testified that they didn't remember it. That was their testimony. But interestingly, Officer Hastings said that material was confiscated because suicides happen in jails. He didn't say it's because people harm each other. You're talking about to run out. You had the fourth category. We know it. Agitated, distressed state of mind. What's the closest case that would come to this constellation of factors? Any circuit case that would say this constellation of factors did put the officers on subjective actual notice? What's your closest case? Not Farmer. No, Commerce v. City of Kino. Converse? Converse v. City of Kino is the closest case with the confiscation of the shoes, coat, and eyeglasses. But our argument, of course, is you consider all the factors together that Farmer allows us to put before the jury. Thank you. Thank you. May it please the court, Grant Blaze on behalf of Calicam County Sheriff Office Dispatch Jailers Delina Hall and Renee McGowan. This is an unfortunate, tragic event. But it happened quickly, and it happened without the knowledge of our jailers that this was a substantial risk. Let me ask you a procedural question. Did you handle a fair number of these cases? Yes, Your Honor. In front of Judge Cummings? Yes, Your Honor. I see in the docket an order finding the court finds the plaintiff's pleadings assert facts which if true would overcome qualified immunity. Is that a form, order that he uses? We've just gone through, as you may know, Carlsville v. Camp and a new opinion issued that you're supposed to do this on a motion to dismiss initially and then have focused discovery. I'm just wondering how much that has penetrated. So is this a form, order where he automatically says, pleading's good enough, let's move on? Anytime you assert qualified immunity in your response to pleadings, that's the order you get. All right. Thank you. Move on. Yes, Your Honor. I think the court nailed it in its opinion when it said that there was no evidence as to whether McGowan or Hall appreciated that Worrell was a suicide risk or that the phone cord would likely be an instrument of suicide by Worrell. Plaintiffs are wanting this evidence to impute actual knowledge, but really it's a should-have-known standard. As we know, that's not the standard in deliberate indifference cases. Again, this is unfortunate, but if you want to look to the four factors that the plaintiffs rely upon for trying to impute actual knowledge that Brenda Worrell was at a substantial risk for suicide and that they acted deliberately indifferent with knowledge of that substantial risk, the first is the screening form. And Judge Barksdale, I agree with you, and there is a difference between being unable to and refusing to. When you're unable to, that suggests that there's a mentation issue that requires further action. When there's obstinate refusal, the person can answer the forms, the person is just not answering the form. There have been cases that have addressed the belligerence and refusal to cooperate in screening forms. In this case, the Brantley v. City of Moss Point case, which was a Fifth Circuit case in 2008, there's a Johnson v. City of Wentworth Village, the Posey v. Southwestern Bell, Ybarra. All these cases have said when somebody refuses to answer psychological screening or suicide tests, that doesn't automatically rise to the level of a constitutional violation. There still must be subjective knowledge by the jailer that that person is a substantial risk for suicide. The absence of those answers doesn't automatically impute or automatically require that jailer to presume that that prisoner or that inmate is suicidal. And I believe counsel said that there was a default policy that unless these questions are answered, that they could be deemed suicidal. That is not the law, that is not the case, and that is not what is prescribed by the Constitution. I believe he said that's what's stated on the form. If the detainee is unable to complete the form, then you've got to ratchet up the possible suicide. Okay, I must have misheard that. But the bottom line is that does not rise to the level of a constitutional violation. The Constitution does not command or compel that every inmate receive psychological or suicide screening. It's a good idea, and we try to do it, but the Constitution doesn't compel it. And the cases out of this circuit have affirmed that lack of that right. So that doesn't automatically impute some sort of knowledge by the jailers of a suicidal tendency, the fact that she was being belligerent. To the fourth point, the belligerence, her condition during her stay. Again, the courts in this circuit have addressed that issue in legions of those cases. As an example, Branton v. the City of Moss Pit, Burns v. the City of Galveston, Nunez v. Devaney, Riggins v. Indianola, Noss v. City of Seven Points, all of these are cited in the brief. But the very issue that they're claiming or alleging gives rise to actual knowledge of the substantial risk of suicide, belligerence, intoxication, failure to cooperate. The courts have all held that is not actual evidence of an intent or substantial risk of suicide. People come to the jail usually in not the best of conditions. They're intoxicated often, they're not happy often, they're belligerent. That happens all the time. If we're going to elevate those behaviors to some risk of suicide, then you're going to have to treat every inmate as a risk of suicide, and that's just not workable, nor is it proper. Not every detainee, not every inmate. I apologize, every detainee. Well, counsel, you certainly may be right about the Constitution, whether you are or not. It does seem to me that Texas may have essentially done what you're talking about, which is to require this sort of intake form, and if it's not to be answered, to watch the person, if I understand the form, until you can get better answers. I'm not saying that answers the question in this case, but you're almost saying that what Texas is demanding is not being done and you shouldn't expect it to be done. Well, let's assume for sake of argument that— I'm not meaning it for sake of argument. I'm just wondering, is that a fair assessment of what this form is supposed to be doing for people who are coming in? Yes, Your Honor. I believe that if somebody is unable to answer these questions, that raises the specter of a potential problem that needs to be addressed. But there is a huge— You just said a little while ago that really that's almost impossible for small cities and counties to be doing. I'm not trying to make a legal point. It just seems to me almost a troubling attitude about this form. Your Honor, maybe I probably was not clear in what I was saying. I'm not saying the failure to answer the form— I was talking about the inmates coming in belligerent and intoxicated. That's fair. You can move on. It's not particularly relevant to whether it's a constitutional violation, but it was concerning to me in the way you were expressing it. Okay, yes, Your Honor. I did not mean that. If there is a true inability to answer these forms, then absolutely measures should be taken, but that's not what the case is here. The cases that have addressed this very behavior have basically said that that does not put a jailer on notice that that person is at a potential risk for suicide. I suppose the biggest factor would be the second, right? If there's a refusal or reluctance and a shame, she's shamed, then they ask frontally, are you suicidal? Have you ever tried before? And then they get the rhetorical answer, you tell me. That's a big red flag, right? This is a person who's just ashamed of perhaps their great vulnerability to just that. Well, my answer would be what she did in showing her risk and it reflecting no visible signs that it happened, the logical assumption by the jailer would be that person has not tried suicide in the past, not attempted suicide in the past. And, in fact, the record reflects that because had she had attempted suicide in the past, there would have been evidence of that. They would have said, wait a second, she committed suicide in the past. Your failure to comprehend that in response to that answer was just wrong. But that's not the case. The record reflects there's no evidence that she'd ever attempted to commit suicide. And when you stick out your arms in an obviously sarcastic tone, but when you stick out your arms and there is no evidence of marks or scars, that is a confirmation that she had not or at least a reasonable inference, and I believe it's an unreasonable inference to draw, that, hey, the fact that somebody says that immediately, you need to treat them as suicidal. As a matter of fact, I assume there's, just as it appears, there was a tragic non-completion of a form that's mandatory, I assume it's equally wrong for them to have put any detainee into a visitor's room. And so you'll acknowledge that that was yet another cascading mistake. Well, Your Honor, obviously we can look at this with the lens of 20-20 hindsight, and it was a tragic mistake. But there's no protocol that allows them ever to put detainees in visitor's rooms. No, this jail was full, and they were not going to house her with another detainee because of her behavior. So they were trying to get a cell open, so they had to put her somewhere because she was doing it. So this was a temporary place for her to calm down while they tried to complete the booking process. And to that point, they weren't done booking her in. They were eventually, if they would not have gotten those answers, they may have taken different steps, but they were still just in the process. This lady was only in our jail for 38 minutes. So it was a fluid situation. We weren't done with her and throwing her in the visitation room and she was going to stay there overnight. This was a process that was ongoing. And so there was no appreciation that she was going to commit suicide, and there was no appreciation that the phone in the visitation room was going to be used by her to do that. This was just a temporary measure so they could, again, complete the booking process and get her into a cell. And relative to that, yes, they took off her shoes and they took her glasses, and that's standard protocol. So it is a precaution for her to not harm herself or others, but that's standard protocol. That doesn't impute, okay, that's done with every pretrial detainee. And so to suggest that that's somehow evidence of scienter, that they're potentially suicidal, again, that's really not the case because that's not an objective manifestation by the pretrial detainee of their intent to commit suicide or that they are a substantial risk of committing suicide. To the point, the Converse case as the most on-point case, that's a case where they brought him in because he attempted to commit suicide. It was known by the jailers. Every single case that was cited by the appellants in this case were known suicidal risks where they were literally brought to the jail for attempting to commit suicide. So they were known risks. There was no objective manifestation by Ms. Worrell at any time that she was going to commit suicide or was at a substantial risk for suicide. And the factors that the appellants are relying upon have all, frankly, been addressed in previous precedent by this court and in this circuit and reflected in the briefing, but belligerence, intoxication, inadequate screening, none of these factors that they're relying upon to impute knowledge to our jailers have been sufficient or have been held to be sufficient by this court. In April of 2019, there was no clearly established law that suggests the actions of these jailers violated Ms. Worrell's constitutional rights. This was a very tragic and unfortunate situation. She came to the jail. They were trying to get her taken care of. She was only in the jail for 38 minutes, placed in a visitation room briefly in order to continue the booking process in order to let her calm down so they could get those answers to those questions. And 14 minutes later, she's found. Let me please the court. John Mark Hogue on behalf of the City of Clyde Police Officers Hastings and Piper. I don't have much that can be added to the discussion beyond what's in the briefing and what's already been talked about by Mr. Blaze as far as the law and the legal circumstances around this case. The things I would like to direct the court's attention to, and if there are any questions, I'd be happy to answer those, relate to the arresting officers who are my clients that I represent in this case. The factors that were listed by Mr. Thomas, that he listed, as you will note, the screening form, the equivocal answer, the confiscation of the shoes, and the condition and demeanor at the jail, none of those have anything to do with the arrest and the decisions made by the officers. Although the briefing tries to imply that there was something wrong done by the officers and the decisions that they made, they were making decisions at the scene in a very tense situation at that moment. In answer to a question that was asked, or an issue that came up, Judge Barksdale, related to the outstanding warrant, I don't have the specific minute's sight on the video, but I do believe the evidence of the video reflects that when they arrived, they ran to check and see if there were warrants. I think something came back indicating that there was a possible warrant for a homicide somewhere. I think they placed him in the handcuffs, and after questioning and further investigation, they determined that that was not an issue, and so they released him from the handcuffs, and he was not arrested on any outstanding warrant at the time. I believe the video is the best evidence, of course, of what happened and what knowledge those officers had. The knowledge, the only knowledge, and this relates to the jailers in the extent that the only knowledge the jailers had prior to coming into the jail, what the condition of the detainee was, was from the officers. And if you look at the video, it clearly shows two officers approaching a situation, a domestic violence situation, that's what the call was, not knowing what the situation was, arriving, being respectful to all persons, to both the husband and Mrs. Worrell in those circumstances, and trying to figure out what happened, trying to figure out what was going on. You see Officer Hastings, I believe, at one point, asking the specific question, does your wife have any history of mental illness, and he says no. There's a question about has she had any mental disability, and he said in the past, and that was the only indication. There was no indication or action by Mrs. Worrell that she seemed to be, that there might be a possibility of self-harm in any way. There was no indication of suicide. The biggest problem they had was a domestic situation with two individuals that were intoxicated, and trying to figure out what to do in that situation and make the decision of who was the aggressor in the situation, what can we do in a situation they couldn't. Mrs. Worrell was planning to leave. She knew that she couldn't leave because she was intoxicated, and she couldn't drive. And in making the determination that she was the aggressor of the situation, officers determined to take her into custody for a Class C assault. There was not any indication that there was a felony charge placed on Mrs. Worrell. It was a simple Class C assault and took her to the jail. And as the video also indicates, she seemed to be rather pleasant, or not pleasant, but she didn't seem to be agitated and upset. In fact, at one point on the video, she basically thanks the officers for getting her out of a bad situation, even though she's being taken to jail. After they enter the jail is when she begins to become belligerent and refusing to cooperate with the jailers in answering the questions. The officers try to chime in and try to help get her to answer the questions. And that's really the involvement of the officers up until that point, other than obviously when the tragic situation arises, the officers also responded immediately, assisted in calling 911, and began heroic efforts of CPR to try to save her life. We don't believe that any of this evidence indicates that there was any evidence of harm, that she had intended to harm herself. Obviously they never reported anything like that to the jailers because they had not seen any of that. In answer to the question related to the intoxication, what we're really arguing, what plaintiffs are really arguing in this case, is essentially that the court should adopt a negligence theory on these sorts of cases or even a strict liability that once an individual goes into the custody of the jail, they are necessarily, if there is any suicide, the jail is at fault for that and the officers are at fault. There's not any indication that the intoxication led to a level of self-harm or that she was going to harm herself at any time up until the time they found her having strangled herself with the phone cord. That's all I can really add as far as the argument goes, other than what's already in the briefing as far as the state of the law. We believe it's well settled in this court, in this circuit, and there's really no indication of evidence of any knowledge of those officers' self-harm, a tendency to self-harm or a substantial risk of it. That should be the end of the case as far as the officers are concerned. I'd be happy to entertain any questions the court may have related to the officers. Looks like no questions. Thank you, Counsel. Thank you. A few remarks in rebuttal. Everybody always says these cases are tragic. What is so tragic is that they are so preventable. The only reason Brenda Worrell died was because these jailers and these officers didn't follow Texas... Counsel, you're making a jury argument. They didn't follow Texas and county policy. Texas policy, in black and white, told them use suicide screening in this situation. Not use suicide screening. Use a suicide watch in this situation, and they didn't do it. The county policy that the officers said they were required to follow says the officers stayed with the detainee through booking. You just heard that she was never finished booking. The officers should have been there the entire time to prevent exactly this from happening, but they didn't do it. That's why it's so tragic, because it was so preventable. If jailers aren't held to account for being deliberately indifferent to the risk that they are told in black and white on the suicide screening form, then they might as well just always opt out of it, just throw it in the trash can, because they would be better off not to document, from a litigation perspective, they would always be better off not to document any of the suicide traits, because they can always say, well, we didn't know about it. We didn't do the suicide screening, even though it's mandatory. But the state of Texas, to some extent, anticipates that. It says you've got to do a suicide watch if the suicide screening form isn't completed. We got a lot of different explanations from the defendants as to why she was put in the form, and again, one of them, we heard today, was that they didn't have room. They didn't have room in the jail, and they needed to put her in the room while they found room in the jail, and that's simply not supported by the video. The video, I wish we had more of it than we did. The defendants say, look at the video. I second that, because I think you will find exactly what we are saying in our brief and exactly what supports our contentions. The video consists, we don't have any video of the suicide itself. Officer Hastings turned his body camera back on immediately after he found out that she had committed suicide, so it picks up several interesting things, and it's also interesting from what it doesn't pick up. Nobody is saying anything like, I just checked on her, and she was fine. Nobody seemed surprised that she used a telephone cord as a means of suicide. When Hastings goes to the cell to assist McGowan, when McGowan is dragging Brenda out of the cell, and she ends up dropping, I'm sure accidentally, dropping Brenda on the floor, and her head audibly bangs against the floor, it's quite clear that she's completely nonresponsive at that point, and has been for some time. And Hastings says, this is at defendants tab 12, mark 16, how long has she been hanging there? McGowan responds, I don't know. So we have both a jailer and an officer, an officer who's supposed to have been staying with her, a jailer who's supposed to be watching her closely saying, we don't know how long she's been hanging there, which supports our position that there's a factual dispute as to whether she was closely watched and monitored after they put her in that room. Nobody, I mean it's undisputed, nobody opened the door to check on her after they put her in that room. They put her in that room, they all walked away, and nobody went back and opened the door to check on her until she was dead, or until she was completely nonresponsive and couldn't be recovered. And all the discussion about why she was put in the room that is recorded on the video was because she was uncooperative. At tab 12, mark 443, Hastings calls the supervisor to report the situation, and he says, she's in visitation right now, she wouldn't cooperate. I guess she hung herself with a phone in there. At mark 745, Piper's talking to another officer, and he points to the visitation room and says, she's in there, she wasn't cooperating. At mark 923 of tab 12, Hastings and Hall are talking about how the four of them are all going to be blamed for Brenda's suicide. And Officer Piper says, well, I mean she wasn't cooperating, and then that's your all's procedure to put her in there when she's not cooperating, and he throws up his hands and he walks away. This all confirms that the defendants were departing from standard policy, what they knew was necessary to protect the detainee to either stay with her and to provide a suicide watch in this situation. And that's because they put her in a room with a ligature that was at least obvious to these defendants that is deliberate indifference. The moment they put her in a room with a ligature subjectively knowing that she was at risk for suicide from the various categories of evidence that I talked about earlier. It is undisputed that they put a distraught individual that had just come to jail who they knew should be watched continuously and should be subject to a suicide watch in a room with means to commit suicide. And that is deliberate indifference. Thank you. Is there anything else I can respond to? All right. Thank you. Good night. 46 seconds. Well, we appreciate the arguments of this last group and of all the arguments that were presented today. We are wrapped up for sitting for this panel. We appreciate all the assistance that's been provided to us by the people in the room back there and others. We are adjourned.